**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **HENRY DAVIS,** ) | |
| ) | |
| **Petitioner,** ) | |
| ) | |
| **vs.** ) | **No. 12 C 1550** |
| ) | |
| **MICHAEL LEMKE,** ) | |
| ) | |
| **Respondent.** ) | |

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

In January 2005, an Illinois judge convicted Henry Davis of first-degree murder in connection with the death of a man near a Chicago nightclub in 2002 and imposed a prison sentence of forty-five years. The Illinois Appellate Court affirmed Davis's conviction on direct appeal. After the Illinois Supreme Court denied his petition for leave to appeal, Davis filed a petition for post-conviction relief. The Circuit Court of Cook County denied the petition, and the Illinois Appellate Court affirmed the decision, followed by the Illinois Supreme Court's denial of his petition for leave to appeal.

Davis has petitioned this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He has made several claims, some filed in an initial *pro se* petition and others in a revised *pro se* petition. He also filed, via counsel, a reply and a motion to amend containing additional arguments. Respondent Michael Lemke, the warden of the prison where Davis is incarcerated, argues that the claims are procedurally defaulted or otherwise without merit. For the following reasons, the Court denies Davis's petition.

**Background**

**A.     Trial court proceedings**

Early on the morning of October 20, 2002, Shenandoah Hogan was shot three times:  once in his back, once in his left arm, and once in his right thigh.  He died the same day.  The shooting occurred outside a Burger King restaurant on South Michigan Avenue in Chicago on the same block as E2, a nightclub operating there at the time. Henry Davis was arrested that same morning and was indicted the following month for first-degree murder.

Davis's bench trial began on January 12, 2005.  The prosecution contended that Davis and Hogan were involved in a fight outside the nightclub, during which Davis shot Hogan and then fled from police, discarding the gun along the way.  Davis's attorney conceded that Davis fired the shots but argued that he did so in self-defense, "to protect himself from deadly harm."  Ex. P at BB-8.  Counsel further contended that Davis did not bring a gun to the club but rather obtained it during a struggle with Hogan and another assailant, during which Hogan was shot.  Then, the attorney argued, Davis shot Hogan again "because he didn't know whether the person in the orange shirt [Hogan] was going for another weapon or what."  *Id.* at BB-13.

The prosecution first called Adrienne Segovia, a deputy medical examiner in the Cook County Medical Examiner's office who performed the autopsy on Hogan and opined that he died as a result of multiple gunshot wounds.  She testified that Hogan's body had three such wounds:  one on the right side of his back that had "coursed back to front"; another on the back of the left arm; and the third on Hogan's right anterior thigh.  *Id.* at BB-20–22.  Segovia testified that the back gunshot wound was consistent

with being shot from behind. Hogan also had "ten abrasions or scrape marks on the body," *id.* at BB-22, which Segovia testified were consistent with Hogan having crawled on a rough surface or pavement. On cross-examination, Segovia testified that the wound to Hogan's thigh entered from the front of the leg and that it was "possible" that the bullet had entered the thigh as a result of a ricochet. *Id.* at BB-34. She further testified that abrasions Hogan had above his eye were consistent with having been in a fight.

After Hogan's mother testified, the prosecution called Jonathan Masupha, a friend of Hogan, who was at the E2 nightclub on the night Hogan was killed. Masupha testified that after leaving E2 that evening, he saw Hogan near the parking lot of a Burger King, where he began fighting with a "big guy"—the same person who earlier had broken up a fight between two women at the club. *Id.* at BB-51. Masupha ran up to the fight and saw a female hitting Hogan in the head with a bottle; Masupha said he then hit the woman who had wielded the bottle. He testified that a larger fight proceeded to break out, and "[t]he whole parking lot seemed like they were participating." *Id.* at BB-53. Masupha said he pulled Hogan "to the back" and then saw "[t]he guy on the side of him" make "a reaching motion. At the same time, I began to turn around, heard shots. I'm running." *Id.* at BB-53–54. Masupha clarified that the man making the reaching motion "was going for his waist," although Masupha did not see a gun. *Id.* at BB-54. As Masupha turned to run from the scene, he "heard a gunshot real loud towards my face," after which he began to run away; when he returned, Hogan "was already in the ambulance." *Id.* at BB-55. Masupha further testified that he did not see Hogan with a gun and that E2 employees performed pat-

downs of those who entered the club that night. On cross-examination, Masupha testified that he thought Hogan's car was parked in the Burger King parking lot but that he did not see it there. He added that there was a slight pause after the first shot he heard, followed by "[t]wo to three, maybe four" others. *Id.* at BB-73.

A witness named Amanda Conkel testified that she was exiting E2 when she heard shots; after taking cover, she got up to see "a guy running"—a person who had had "words" with Hogan at the club—"and Shenandoah was just falling." *Id.* at BB-89–90. She testified that she later identified Davis in a lineup as the person she saw running after the shooting, and she identified a dark blue Monte Carlo as the car she saw speeding from the Burger King parking lot after the shooting.

The prosecution also called Ira Lynch, a sergeant in the Chicago Police Department who was monitoring crowd control from his car in the area of E2 when he "saw what appeared to be a scuffle." Ex. Q at BB-162. He then heard shots fired and was moving toward the Burger King when he "observed a subject who was the victim crawling into the street." *Id.* He also saw, from about twenty feet away, "the victim crawling out into the street and someone standing over him shooting down at him, the offender." *Id.* at BB-163. The shooter, whom Lynch identified as Davis, fired three times, Lynch testified; Lynch then moved closer, at which point Hogan pointed to Davis and said that Davis had shot him. Lynch said Davis walked quickly to a dark blue vehicle and drive out of the Burger King parking lot, and Lynch blocked Davis's exit with his squad car, after which Davis drove over the sidewalk. Lynch said he followed Davis as he drove around the area, until Davis lost control of his car and ran into a tree. Davis then exited the car, Lynch testified, and began running away down Cermak Road while

officers gave chase.  Later that morning, Lynch said, he identified Davis in a lineup at Area 4 police headquarters.

James Brill, another Chicago police officer, also testified.  He said he had responded to a call reporting shots fired around 4:00 a.m. on October 20, 2002, and followed a car that looked like the one described in the call.  He followed Davis in the car around local streets until Davis jumped a curb and hit a tree.  Brill testified that Davis exited the vehicle and ran, and Brill followed on foot.  Brill said he saw that Davis was carrying a handgun, which ejected its magazine when Davis stopped at one point to observe that his shoes had come off.  Brill picked up the magazine and continued chasing Davis.  Brill and other officers apprehended Davis as he attempted to climb a fence into the Metra rail yard.  As Davis was being moved into a nearby squad car, Brill heard Davis say "that he had hoped that he shot the right person."  *Id.* at BB-213.  Davis had gotten rid of the gun at some point during the chase, and Brill testified that the police canine unit was called in and found a gun in a compost bin shortly after the chase ended.  The gun, Brill said, was the same one Davis had been holding earlier.

The prosecution also called Andrew Block, another Chicago police officer, who saw Davis running on foot the morning of the shooting.  Block testified that he was among the officers who arrested Davis and also heard him say, "I hope I shot the right guy."  *Id.* at BB-229.  Other officers who had collected evidence from the Burger King testified, along with a forensic investigator who found evidence there and at the scenes of Davis's car crash and arrest.  Cid Drisi, a forensic scientist with the Illinois State Police, testified that he had tested a pistol, one bullet, casings, a magazine, and some clothing, including a jacket with a hole in it.  The jacket, Drisi testified, was "consistent

with the passage of a bullet," and the bullet and cartridges had been fired from the submitted pistol. Ex. P at BB-125–32. John Onstwedder, another forensic scientist from the state police, testified that there were no latent fingerprints on the cartridges, pistol, or magazine he tested in this case.

After unsuccessfully moving for a directed finding of not guilty at the conclusion of the prosecution's case, the defense called Eric Mason, who testified that he was at E2 early on the morning of October 20, 2002, where he saw "some arguing," involving a "lot of people" who were "swinging." Ex. Q at CC-18, 26. After he left the club, he was attacked by two men. One of them, Mason testified, wore an orange shirt and hit him in the nose; Mason thought the assailant had "a shiny object" in his hands. *Id.* at CC-21–23. On cross-examination, he clarified that the object looked like a gun. James Walker, who was with Mason at E2, said he saw "guys on top of guys brawling" at the club. *Id.* at CC-38. After leaving the club, Walker said, he saw Mason bent over and holding his hands to his face; Walker then ran across the street and saw "15 to 20" men and women fighting. *Id.* at CC-40. One of the men was wearing an orange shirt, he said, and "made a gesture at me as far as with his hand up under his shirt," which Walker said made it look like he was reaching toward a gun in his waistband. *Id.* at CC-41. (On cross-examination, he testified that he did not actually see a gun.) Walker said he retrieved Mason and drove him to the hospital and that Mason told him he had been hit in the face with a pistol.

Raquel Chapman, Davis's girlfriend and the mother of his son, also testified. She testified that she was at E2 on the day in question and that the club had security people using metal wands to check entrants for weapons. Chapman said she hugged Davis

both at E2 and shortly after leaving the club and did not feel a metal object on him when doing so. She parted from Davis after leaving the club, she testified, and later returned there looking for Davis and saw a body lying on the ground. Later, on her route back home, she saw Davis's car after it had been in an accident.

Davis testified last. He said that security guards searched him with metal wands when he entered E2 on the morning in question and that he did not have a gun on his person or in his car. After leaving the club, Davis said, he walked Chapman to her car and then went toward the Burger King on South Michigan; there, "a guy approached me with a gun." *Id.* at CC-77. Davis testified that he grabbed the gun and "tussled" with the man over it; the gun "went off a couple times." *Id.* at CC-79. At that point, Davis said, the man's friends approached him and started hitting him from behind. "Then once they were attacking me and I grabbed possession of the gun I just fired the gun." *Id.* at CC-80–81. When asked why he was firing the gun, Davis said, "They were attacking me. I don't know what was going on. I didn't know what it was. So once I got the gun I was protecting myself." *Id.* at CC-81. The person he fired at, he said, was wearing an orange shirt and had been hitting him. Afterward, Davis said, he ran to his car and left, with the police chasing him. On cross-examination, Davis said he shot at "[t]he guy that was hitting [me] from behind" after turning around to face him. *Id.* at CC-85. "I guess he proceeded to run once I turned around. He didn't have his back to me when I ended up open and fired." *Id.* at CC-86. The prosecutor then asked whether Davis shot the man when he had his back to him and was trying to get away. Davis responded that he did not know and was "just in the heat of the moment" but admitted he never saw the man he had shot holding a gun. *Id.*

After closing arguments, the court convicted Davis of first-degree murder. In explaining its decision, the court said that it did not know where Davis got the gun: "Whether his gun came from his cast in his arm, whether it came from a bush, his girl friend's car, his car, whether he had it all night long, I do not know." *Id.* at CC-112. The court credited Lynch's testimony that Davis was standing over Hogan and "shooting into his body." *Id.* The court noted that the shots had gone "from back to front and upward consistent with crawling, where the victim being down [sic] on the grounds [sic] when shot." *Id.* at CC-113. "[T]hat is not self-defense," the court said. *Id.* The court also cited Davis's leaving the scene and running from police, which "was remarkable flight from the police after the shooting," including Davis's turning toward a pursuing officer with a weapon in hand. *Id.* Davis's sentence was forty-five years.

## B.   Appeal and post-conviction proceedings

On appeal, Davis presented two issues. First, he argued that his claim of self-defense had shifted the burden of proof to the prosecution, noting that the Illinois self-defense statute permits the use of deadly force to prevent a forcible felony. There was "more than enough evidence," Davis argued, to show that he did not have a gun and that he was attacked by robbers. Ex. C at 22–23. Davis contended that the testimony of Lynch, the officer who said he saw Davis shooting down at Hogan, was "mistaken" and inconsistent with Masupha's testimony, because Lynch did not see some of the things Masupha reported about the "brawl" outside the Burger King. *Id.* at 24–27 (citing studies about the frequency of mistaken eyewitness identifications). Second, Davis contended that the prosecution had "at most" proven he was guilty of second-degree murder. *Id.* at 30.

The appellate court affirmed Davis's conviction. The court first addressed Davis's self-defense argument. It noted that self-defense is an affirmative defense, "and once raised by defendant, the State has the burden of proving beyond a reasonable doubt that defendant did not act in self-defense . . . ." Ex. A at 8. The court listed six elements of self-defense and said that "[d]efendant's claim of self-defense must fail if any one of these elements is negated by the State." Ex. A at 8 (citing *People v. Lee*, 213 Ill. 2d 218, 224, 821 N.E.2d 307, 311 (2004), and *People v. Young*, 347 Ill. App. 3d 909, 920, 807 N.E.2d 1125, 1134 (2004)). Considering the evidence by assessing whether "any rational trier of fact could have found beyond a reasonable doubt that defendant failed to act in self-defense," the court held that substantial evidence supported the trial court's conclusion. *Id.* at 9. The court placed emphasis on Lynch's testimony, Davis's flight from police, and the autopsy results showing Hogan was shot in the back. The court said that even if Davis's version of events were true—that he was the victim of an assault—the facts showed that Hogan himself did not have a gun but was hitting Davis from behind and then was trying to get away when Davis shot him. Therefore, Davis "failed to show that the force he used against the victim was necessary to justify self-defense." *Id.* at 10. The court also rejected Davis's alternate argument that he was guilty of second-degree murder at most. Considering the fact that Davis "shot the unarmed victim in the back while the victim was crawling away from him," the court said that "no mitigating factors were presented" sufficient for "a finding of second degree murder." *Id.* at 10–11.

Following the appellate court's decision, Davis filed a *pro se* petition for leave to appeal with the Illinois Supreme Court, which the court denied in November 2008. In

2009, Davis filed a post-conviction petition. He made ten claims, eight of which concerned the performance of his trial counsel. These included claims regarding how counsel handled Davis's theory that he was attacked in order to rob him of his jewelry, misrepresentations about the duties and actions of the prosecutors and detectives handling his case, counsel's failure to investigate those individuals and their reports, charts, and inventory procedures, and his recommendation that defendant waive his right to a jury trial. Davis also contended that his due process rights were violated when prosecutors and investigators removed his jewelry and falsified reports. Finally, Davis claimed that 730 ILCS 5/5-8-1(d)(i), which provides for sentencing enhancements based on use of a firearm, violated the constitution's Equal Protection Clause. Davis attached several affidavits to his petition as well as photographs of the jewelry in question.

The trial court denied Davis's post-conviction petition. The court first held that "all of petitioner's claims could have been raised on direct appeal" but were not and were thus waived. Ex. S at C125. The court nonetheless proceeded to address the merits of the claims. It noted that many of the claims derived from Davis's argument that Hogan tried to rob him and that police improperly removed and inventoried his jewelry. The court said it was unclear how these events violated Davis's due process rights and that because Hogan was unarmed and retreating when Davis shot him, Davis did not present facts sufficient to disturb the finding that he did not act in self-defense. The court also found "baffling" Davis's claim that the police falsified their reports; it said this claim could not negate the fact that Davis did not meet the elements of self-defense. *Id.* at C127. Citing *Strickland v. Washington*, 466 U.S. 668 (1984), the court also held that Davis could not demonstrate that his attorney's various failures to

investigate prejudiced him. Davis's argument that there was a police cover-up was "speculative and implausible," the court said, and regardless of any failure by counsel to investigate it, the outcome of the trial would not have changed, because Davis "shot an unarmed man from behind as he crawled across the ground <u>away</u> from petitioner." Ex. S at C129. In addition, the court held that trial counsel's recommendation that Davis request a bench trial was trial strategy that did not constitute ineffective assistance. The court noted that it has "duly admonished" Davis regarding the jury waiver and that he did not object to the waiver, and it concluded that the waiver was not "unknowing or unintelligent." *Id.* at C130. Finally, the court rejected Davis's argument that the sentencing enhancement statute violated the Equal Protection Clause, citing *People v. Sharpe*, 216 Ill. 2d 481, 839 N.E.2d 492 (2005). In sum, it found that Davis's claims were "frivolous and patently without merit" and dismissed the petition. Ex. S at C132.

Davis appealed the circuit court's decision in August 2010, presenting just one claim on appeal: that the circuit court's decision was incorrect because "trial counsel was ineffective for failing to present evidence supporting Davis's claim of self-defense." *See* Ex. I at 15. Davis argued, as he had before the trial court on his post-conviction petition, that trial counsel should have presented evidence that Davis was wearing jewelry at the time of the incident and that he believed he was being robbed. He contended that his shooting of Hogan may have been based on "a reasonable or unreasonable belief that he remained vulnerable to further assault from Hogan— perhaps from a weapon on Hogan's person or hidden in or near the car that Hogan was touching when he was shot." *Id.* at 23. Davis's brief also touched on the notion that he

was guilty of, at most, second-degree murder because he acted in self-defense, though he did not present this as a separate argument.

The appellate court affirmed the dismissal of Davis's post-conviction petition. After first concluding that Davis had not waived his claims, contrary to the circuit court's ruling, the appellate court proceeded to hold that it was legitimate trial strategy for trial counsel to decide not to present evidence that Davis was being robbed of his jewelry. The court cited Davis's testimony that he did not know whether he was being robbed and the fact that police reports did not mention a robbery.  It also pointed to trial counsel's attempts "to show that defendant may have been the victim of an attempted robbery through other means, *i.e.*, the testimony of Mason and Walker."  Ex. H at 9. Further, the court said trial counsel's opening statement showed that he was already making a self-defense argument.  "[T]he fact that defendant was wearing jewelry at the time he was allegedly being robbed would not add any relevant evidence to his self-defense argument because it did not matter why he was being attacked."  *Id.* at 9–10. Finally, the court determined that Davis had not shown prejudice from his attorney's actions, because the evidence of his guilt of first-degree murder was overwhelming.  It also held that the jewelry evidence would not have been sufficient to reduce his offense from first- to second-degree murder, because the record did not show that Davis acted in self-defense, either reasonably or unreasonably.  *Id.* at 11.

Following the appellate court's decision, Davis filed a petition for leave to appeal with the Illinois Supreme Court.  The court denied the petition in November 2011.

**C.    Habeas corpus petitions**

Davis filed a *pro se* habeas corpus petition in this Court in March 2012, arguing claims of ineffective assistance of counsel for failure to investigate, prosecutorial misconduct, and the unconstitutionality of the statute used to enhance his sentence. One month later, in April 2012, Davis filed an amended *pro se* habeas corpus petition, making three other claims.  (The amended petition did not reference Davis's earlier petition, but the Court is considering all of the claims in both of them.)  In the amended petition, Davis argues that there was insufficient evidence to convict him and override his self-defense argument; that he was at most guilty of second-degree murder; and that his trial counsel was ineffective for failing to present evidence supporting his self-defense theory.

After Lemke responded, newly-retained counsel for Davis filed a reply, which he combined with a motion to amend his habeas corpus claims.  In the reply, Davis states that his counsel "found additional facts which create meritorious claims that principles of federal law were unreasonably applied" and that leave to amend is needed "to fully organize the facts in the state court record and place them in a meaningful light so as to reveal the errors."  Repl. ¶¶ 6–7.  Davis then outlines principles of law related to the right to self-defense and notes a discrepancy between the Illinois state statute on self-defense and the way state courts have addressed self-defense.  He argues that trial counsel should have recognized the discrepancy and argued it in relation to the self-defense claim.  Davis further contends that the application of the courts' test for self-defense violated his due process rights.

Lemke filed a supplemental response to the reply and motion to amend. Observing that it is unclear what new arguments Davis was seeking to advance that would warrant leave to amend, Lemke argued that some of the points in the reply concerned claims Davis already made in his amended petition and that any new claims introduced in the reply are either not cognizable, procedurally defaulted, or lacking in merit. Davis responds in a supplemental reply that Lemke "went beyond the intended task of whether the petitioner could amend his habeas claims, thereby creating a document which was an answer to the claims." Supp. Repl. at 1. Therefore, Davis says, he will "not accept the invitation of respondent to reply." *Id.* at 2. He proceeds in the supplemental reply to outline the principles of the "relation back" doctrine under *Mayle v. Felix*, 545 U.S. 644 (2005), and apply them to his case.

## Discussion

A petitioner is entitled to a writ of habeas corpus "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). A federal court may issue a writ of habeas corpus on a claim that was adjudicated on the merits in state court proceedings only if the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* § 2254(d); *see also McElvaney v. Pollard*, 735 F.3d 528, 531–32 (7th Cir. 2013).

**A.      Claims in initial petition**

In his initial habeas corpus petition, Davis makes three claims.  First, he argues that his defense counsel failed to investigate the case properly, because he "never investigated or looked at Police reports."  Pet. at 5.  Had counsel done so, Davis says, he would have noticed handwritten modifications and acted upon them.  Second, Davis contends that there was prosecutorial misconduct before his trial, because one of the assistant state's attorneys removed the jewelry Davis was wearing when arrested, "improperly inventoried" it, tampered with it, and gave it to Davis's friend.  *Id.*  The jewelry, Davis says, was potentially relevant and material to his self-defense argument at trial.  Finally, Davis argues that an Illinois statute requiring an addition of fifteen years to a sentence for first-degree murder if committed with a firearm is unconstitutional. See 730 ILCS 5/5-8-1(d)(i).

In response, Lemke contends that these arguments are procedurally defaulted because they were not exhausted through one full round of state court review.  He also argues that Davis has not demonstrated cause for the default and prejudice from the violation of federal law, and that he cannot show he is innocent such that failure to consider his claims would amount to a fundamental miscarriage of justice.  Further, Lemke says Davis waived his initial three claims by failing to incorporate them into his amended petition.  The Court rejects the last of these points; Davis was proceeding *pro se*, and there is no basis to believe that in filing the amended petition, he intended to eliminate his original claims.  Rather, he was simply adding to them.

The Court addresses the procedural default issue first.  "As a general matter, federal habeas courts are precluded from considering habeas claims that were

procedurally defaulted because they were not presented for one complete round of state court review." *Coleman v. Lemke*, 739 F.3d 342, 349 (7th Cir. 2014). In Illinois, this means that "a petitioner must present a claim at each level of the state court system, either on direct appeal or in post-conviction proceedings." *McDowell v. Lemke*, 737 F.3d 476, 482 (7th Cir. 2013). Otherwise, the claim is defaulted. A federal court may consider a defaulted claim if there is "cause for the default and prejudice from a violation of federal law." *Martinez v. Ryan*, 132 S. Ct. 1309, 1316 (2012). Otherwise, a petitioner can overcome a default by demonstrating that "failure to consider his claim would result in a fundamental miscarriage of justice (i.e., a claim of actual innocence)." *Weddington v. Zatecky*, 721 F.3d 456, 465 (7th Cir. 2013) (internal quotation marks omitted).

Davis did not pursue any of the three claims from his original habeas corpus petition through a complete round of state court review, and he does not contend otherwise in any of his submissions to this Court. The claims in question were first asserted in Davis's post-conviction petition. But argument in his briefs on appeal and in his petition for leave to appeal following the dismissal of the petition was limited to his counsel's failure "to present evidence showing that Davis was wearing expensive jewelry at the time of his confrontation with Hogan." Ex. I at 15; *see also* Ex. L at 17 ("If defense counsel had presented evidence that Davis was wearing expensive jewelry and had not advised Davis to avoid testifying about the armed robbery attempt, the court would have been presented with an entirely different (and accurate) scenario."). Davis's petition for leave to appeal did mention "counsel's failure to properly acquaint himself with the police reports in Davis' case (specifically, that Davis had, in fact, previously

informed the police that he believed he was the victim of an attempt armed robbery)." Ex. L at 16. However, Davis made no similar statement in his appeal to the Illinois Appellate Court.

With regard to the other two claims, though Davis asserted them in his original post-conviction petition, *see* Ex. S at C53 & C57, he did not raise either claim in his post-conviction appeal briefs or his petition for leave to appeal. Finally, he did not raise any of the three claims on direct appeal.

For these reasons, all three claims are defaulted. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999) ("Boerckel's failure to present three of his federal habeas claims to the Illinois Supreme Court in a timely fashion has resulted in a procedural default of those claims."). Davis does not argue that he is able to demonstrate cause for the defaults, that he is actually innocent, or that excusing the defaults is otherwise necessary to prevent a miscarriage of justice. Because Davis has not established a sufficient excuse for his defaults, the Court may not consider the merits of the claims.

**B.     Claims in amended petition**

In his amended petition, Davis advances three claims. First, he argues that the prosecution offered insufficient evidence at his trial to convict him, pointing to evidence that he says supports the proposition that he acted in self-defense. Second, he contends that the prosecution "at most" proved him guilty of second-degree murder, because his shooting of Hogan arose from "mutual combat" and Hogan was "an aggressor." Amended Pet. at 18–21. Third, Davis advances a claim of ineffective assistance of counsel distinct from the one he asserted in his first petition. Specifically, he argues that his trial counsel should have presented certain evidence supporting his

self-defense argument, namely the fact that he "was wearing expensive jewelry at the time he was held at gun-point," along with his "impression that he was robbed." *Id.* at 22. For each of these three claims, Davis requests an evidentiary hearing.[1] Lemke contends that the appellate court's rulings on these issues were not unreasonable and that Davis's argument on his eligibility for a second-degree murder conviction is not cognizable here and otherwise lacks merit.

### 1. Sufficiency of the evidence

Davis argues in his amended petition that the state appellate court's decision to affirm his conviction was an unreasonable application of *Jackson v. Virginia*, 443 U.S. 307 (1979). Davis says he presented evidence of self-defense sufficient to shift the burden of proof to the prosecution. He then contends, focusing on the fight that occurred before he shot Hogan, that the prosecution failed to successfully rebut his evidence of self-defense. Specifically, Davis says that Sergeant Lynch's testimony was "mistaken" because he could not see the fight that preceded the shots and that Masupha provided details of the fight that show Davis was defending himself. Amended Pet. at 16. Davis contends: "the defense presented uncontradicted evidence that Petitioner was unarmed, was not the aggressor, and had to pull the gun away from his

---

[1] At the conclusion of each of his claims, Davis says that he "challenges the presumption of correctness of the State court's factual finding because he has rebutted this presumption with clear and convincing evidence." *See* Amended Pet. at 17, 21, 26. A state court's factual findings are presumed correct, and Davis cites the proper standard—he has the burden to rebut this presumption with clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). Davis makes no argument, however, beyond his general contention that he has succeeded in satisfying the standard. And as Lemke points out, Davis does not identify any particular finding as incorrect. Resp. at 14. Even if the Court were to assume that Davis intends his entire amended petition as a factual challenge to the state appellate court, he has not offered the sort of clear and convincing evidence necessary to overcome the presumption that the findings in question are correct.

assialants [sic] before he fired in self defense." *Id.* at 17. He further argues that Illinois

law permits the use of deadly force if the person wielding the force reasonably believes

it is necessary to prevent a forcible felony.

Lemke counters that the appellate court's decision to affirm Davis's conviction

was a reasonable application of the standard articulated in *Jackson*. He argues that

Lynch's testimony was credible and corroborated by the autopsy of Hogan, and he

points to Davis's flight from police and statement that he hoped he shot the right person

as additional evidence of guilt.

"The burden on a sufficiency-of-the-evidence challenger is heavy." *United States

v. Bloch*, 718 F.3d 638, 641 (7th Cir. 2013). "[T]he relevant question is whether, after

viewing the evidence in the light most favorable to the prosecution, *any* rational trier of

fact could have found the essential elements of the crime beyond a reasonable doubt."

*Jackson*, 443 U.S. at 319. The burden is even more daunting in a habeas corpus

proceeding. "*Jackson* claims face a high bar in federal habeas proceedings because

they are subject to two layers of judicial deference"—first, the deference due to a

conviction on direct appeal, and second, a federal court's duty not to disturb a state

court's decision on sufficiency of the evidence unless it was "objectively unreasonable."

*Coleman v. Johnson*, 132 S. Ct. 2060, 2062 (2012) (per curiam).

The appellate court's decision in Davis's direct appeal was not an unreasonable

application of *Jackson*. The court cited facts sufficient to convince a rational trier of fact

to find that the prosecution had met its burden to prove beyond a reasonable doubt that

Davis committed first-degree murder and that he did not act in self-defense. The court

identified several items of evidence that led to its conclusion that the prosecution had

proven Davis's guilt beyond a reasonable doubt. It devoted the most space to Lynch's testimony, noting that he was first prompted to arrive at the scene by hearing gunshots; thereafter, he testified, he saw Hogan crawl into the street and Davis shoot down at him three times. The appellate court also credited Lynch's testimony that Hogan told Lynch that Davis shot him as well as Davis's statement when apprehended that he hoped he shot the right person. The court noted that the autopsy supported Lynch's testimony in that it showed "that the victim had been shot in the back" and was thus "sufficient to support the trial court's finding that defendant did not act in self-defense." Ex. A at 10. The court also stated that Davis's flight from police after shooting Hogan supported its conclusion. Further, the court reasoned, even if Davis had been attacked and Hogan was hitting him in the back as he claimed, he nonetheless shot Hogan in the back once he started to run or turn away. Therefore, the appellate court held, a rational trier of fact could have found beyond a reasonable doubt that Davis was not acting in self-defense when he shot Hogan.

This conclusion was not unreasonable. Lynch's testimony was clear and unequivocal, and it was consistent with the testimony of Segovia, the medical examiner who said Hogan's back wound was consistent with being shot from behind.

Further, Davis is not necessarily correct that the testimony of Lynch and of Masupha are contradictory. Davis argues that Lynch's "version of the events was in many respects inconsistent with Masupha's testimony." Amended Pet. at 16. In support, Davis says Lynch was farther from the brawl than Masupha was and that Davis did not see a woman hit Hogan with a bottle, Masupha hit that woman, or a "huge" guy fighting Davis. *Id.* Davis further argues that "Lynch added a detail—that Petitioner shot

Hogan—which Masupha, who was standing at Hogan's side, did not see." *Id.* Lynch's testimony, Davis claims, is therefore "irreconcilable" with Masupha's. *Id.* Masupha testified. however, that he fled the scene of the fight after hearing a round of gunshots. Lynch, too, heard gunshots; he testified that he was monitoring crowd control outside of E2 when he heard "loud reports, shots fired." Ex. Q at BB-161. He then "immediately proceeded closer" to where he heard the shots coming from, having seen "what appeared to be a scuffle" there. *Id.* at BB-162–63. Then he "observed a subject who was the victim crawling into the street," with "someone standing over him shooting down at him." *Id.* It is clear from this testimony that Lynch heard two sets of shots: first the "loud reports" he heard coming from the scene of a scuffle, and second when he saw Davis shooting down at Hogan. Masupha did not testify to hearing a second set of shots; his own testimony is that he left the scene after hearing one set. Lynch was at the scene for both sets of shots, and he testified as such. The fact that Lynch did not witness the fight up close before seeing Davis shoot Hogan is beside the point. And the fact that Masupha fled after hearing one series of shots does not mean there were no more shots after he left the scene.

Furthermore, Davis's own trial testimony was consistent with there being two sets of shots, as noted in this exchange:

> Q      When you were struggling for the gun, about how many times did it go off?
>
> A      I would have to say like maybe 3 times.
>
> Q      And then what happened?
>
> A      Then once they were attacking me and I grabbed possession of the gun I just fired the gun.

| THE COURT | What? |
|---|---|
| THE WITNESS | I just fired the gun. |

*Id.* at CC-80–81.  He was later asked who he was firing at once he had gained

possession of the gun; he answered, "Anyone [sic] of the guys in the crowd."  *Id.*  Given

these statements, it was not unreasonable for a trier of fact to credit Lynch's testimony

that he heard shots fired in a scuffle, moved closer to that scuffle, and then saw Davis

shooting down at Hogan, who was crawling away.  Finally, as the appellate court noted,

even if Davis had been attacked, a reasonable fact finder could determine that his

shooting into the back of an unarmed man on the ground was not consistent with having

acted in self-defense.

This result does not change simply because, as Davis argues, the Illinois self-

defense statute permits the use of deadly force if a person believes the force is

necessary to prevent a forcible felony.  The appellate court determined that the threat

Davis was battling had ceased by the time the aggressor, Hogan, was on the ground.

Regardless of whether Hogan's earlier actions constituted a forcible felony, he was not

committing one, or about to commit one, as he crawled away.  Davis shot an unarmed

man who, by Davis's own admission, was no longer attacking him.  He testified that he

acquired a gun from one of his attackers, who then ran away; Davis said he then

"turned around" and Hogan "proceeded to run," but never had a gun.[2]  *Id.* at CC-85–87.

---

[2] Davis's testimony on one aspect of this point was inconsistent.  First, he said Hogan
"proceeded to run once I turned around."  Ex. Q at CC–86.  Then, he said Hogan "didn't
have his back to me when I ended up open and fired."  *Id.*  Finally, when the
prosecution asked if Hogan had his back to Davis when Davis shot him, Davis said, "I
really don't know about that part.  I was just in the heat of the moment."  *Id.*  It was not
unreasonable for the trier of fact to credit Lynch's testimony that Davis shot Hogan when
Hogan was on the ground with his back to Davis, over this testimony; this Court cannot

Davis is therefore incorrect that the testimony at trial on this point was inconsistent and that the state courts' reliance on Lynch's testimony was misplaced. Given Lynch's testimony along with the evidence that corroborated it, the appellate court's decision to affirm the trial court's conclusion was not an unreasonable application of *Jackson*.

**2.      Second-degree murder**

Davis contends that because he was involved in "mutual combat" with Hogan and others on the night of the shooting, he had a reasonable belief that deadly force was justified.  Amended Pet. at 18.  He says that as a result, he was guilty of, at most, second-degree murder under 720 ILCS 5/9-2(a)(2), not first-degree murder.  In making this argument, Davis largely goes over the same ground covered in his sufficiency-of-the-evidence claim, arguing that Masupha's testimony proved there was a large fight and that Lynch's testimony did not contradict that fact.  In response, Lemke argues that this argument is not cognizable in this Court because it does not have a federal constitutional basis and that the claim is otherwise meritless because the appellate court's rejection of the argument was not unreasonable.

An inquiry into whether a prior ruling is correct under state law "is no part of a federal court's habeas review of a state conviction."  *Estelle v. McGuire*, 502 U.S. 62, 67 (1991).  "[I]t is only noncompliance with *federal* law that renders a State's criminal judgment susceptible to collateral attack in the federal courts."  *Wilson v. Corcoran*, 131 S. Ct. 13, 16 (2010) (per curiam) (citing 28 U.S.C. § 2254(a)).  The Seventh Circuit

---

appropriately revisit that determination.  *See United States v. Taylor*, 637 F.3d 812, 815–16 (7th Cir. 2011) (courts are not to "second-guess" such determinations). Regardless, neither Lynch's nor Davis's testimony was inconsistent with the proposition that Hogan was no longer attacking Davis when Davis shot him.

recognized this principle in *Thompson v. Battaglia*, 458 F.3d 614 (7th Cir. 2006), where a habeas petitioner challenged the application of Illinois's second-degree murder statute. The court sidestepped the merits of the argument, citing *Estelle*. "Thompson does not argue that [the Illinois Supreme Court]'s interpretation of the second-degree murder statute violates any federal law; we therefore lack authority under 28 U.S.C. § 2254 to grant his petition on this basis." *Id.* at 618 (citing *Estelle*, 502 U.S. at 67–68).

Davis's argument can be understood as challenging whether there was sufficient evidence to convict him of first-degree murder, but if that is his argument, it lacks merit for the reasons described in the previous section. To the extent Davis is arguing something other than sufficiency, he argument is based entirely on state law. He cites several Illinois cases on second-degree murder, along with the state's second-degree murder statute, arguing that the facts of his case match up with those he cites. *See* Amended Pet. at 18 (citing *People v. Woodard*, 367 Ill. App. 3d 304, 854 N.E. 2d 674 (1st Dist. 2006); *People v. Garibay*, 366 Ill. App. 3d 1103, 853 N.E. 2d 893 (2d Dist. 2006); *People v. Blackwell*, 171 Ill. 2d 338, 665 N.E. 2d 783 (1996)).[3] This is not a question that involves "the Constitution or laws or treaties of the United States." *See* 28 U.S.C. § 2254(a). Instead, it requires an interpretation of the Illinois second-degree murder statute and case law, and an inquiry into the mitigating factors they require. This argument is not a cognizable ground for issuance of a writ of habeas corpus.

---

[3] The Court notes that although Davis cites these cases for general Illinois case law on second-degree murder, they are unhelpful to his argument. In two of them, defendants convicted of first-degree murder argued that they were provoked and thus guilty of second-degree murder at most; both lost. *See Blackwell*, 171 Ill. 2d at 356–59; *Woodard*, 367 Ill. App. 3d at 316–17. In the third case, the defendant pled guilty to second-degree murder, but the court observed that "the evidence of mutual combat appears marginal at best," and it noted that "mutual combat" requires the defendant's retaliation to "be proportionate to the provocation." *Garibay*, 366 Ill. App. 3d at 1110.

The Court acknowledges that Davis cites two Supreme Court cases in the section of his petition corresponding to this claim. He concludes his argument on this claim by contending that "the State court's adjudication resulted in a decision which is contrary to, and involved an unreasonable application, of [sic] clearly established Federal law as determined by the Supreme Court of the United States in Jackson v. Virginia, and Patterson v. New York." Amended Pet. at 21 (citation omitted). He adds that state courts had "ruled contrary to the Supreme Court in similar situations," but "the State courts identified the correct principle of law." *Id.* A mere reference to *Jackson* and *Patterson* does not make his claim cognizable, to the extent he is arguing anything other than insufficiency of the evidence, a point the Court has already considered and rejected. Davis also does not explain how the appellate court's decision against him on the second-degree murder question was "contrary to the Supreme Court." Amended Pet. at 21. For these reasons, the Court overrules this claim.

**3.      Ineffective assistance of counsel:  failure to present evidence**

Davis's third claim in his amended petition is based on one from his post-conviction petition:  his "trial counsel was ineffective for failing to present evidence showing that he was wearing expensive jewelry at the time of his confrontation with Hogan." Amended Pet. at 22.  This evidence, Davis argues, would have supported his theory of self-defense, because he contended that Hogan was trying to rob him of the jewelry prior to their lethal altercation.  He says that trial counsel dissuaded him from testifying that he was the victim of an attempted robbery on the basis that he was not sure if he was being robbed and police reports did not mention the robbery.  Davis argues, however, that his own investigation showed he did tell police that he thought he

was being robbed.  Further, Davis argues, the state appellate court's conclusion that trial counsel's actions amounted to trial strategy was incorrect.  Davis contends that the trial judge's expressed lack of knowledge about where the murder weapon came from shows he was prejudiced from trial counsel's failure to show that it came from a robbery.

Lemke responds that the appellate court's decision was not unreasonable, because trial counsel's actions fit within the category of trial strategy, given the fact that counsel considered the jewelry evidence but deliberately decided against using it.  Also, Lemke argues, the appellate court's decision on the absence of prejudice was not unreasonable, because the evidence against Davis was overwhelming.

In order to establish a claim of ineffective assistance of counsel, a petitioner must show both deficient performance and prejudice.  *Strickland*, 466 U.S. at 687.  To qualify as deficient, the performance must "f[a]ll below an objective standard of reasonableness," considered "under prevailing professional norms."  *Id.* at 688.  Courts must be "highly deferential" when scrutinizing counsel's performance, which is subject to a "strong presumption" that it "falls within the wide range of reasonable professional assistance."  *Id.* at 689.  As for prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.* at 694.

The Illinois Appellate Court rejected Davis's ineffective assistance of counsel claim for his trial counsel's failure to present evidence that he was wearing jewelry prior to his shooting of Hogan.  Thus this Court's review is "doubly deferential," owing to the application of both *Strickland* and the Antiterrorism and Effective Death Penalty Act.

*Bailey v. Lemke*, 735 F.3d 945, 949 (7th Cir. 2013). "We take a 'highly deferential' look at counsel's performance, through the 'deferential lens of § 2254(d).'" *Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011) (citations omitted) (quoting *Strickland*, 466 U.S. at 689; *Knowles v. Mirzayance*, 556 U.S. 111, 121 n.2 (2009)).

In Davis's case, the appellate court recited the correct standard for ineffective assistance of counsel, noting that Davis had to show that his "counsel's performance fell below an objective standard or reasonableness" and that he was prejudiced as a result. Ex. H at 7–8 (citing *People v. Hodges*, 234 Ill. 2d 1, 17, 912 N.E.2d 1204, 1212 (2009)). The court correctly noted that Davis's trial counsel did not fail to make a self-defense argument on Davis's behalf, and the court concluded that the jewelry evidence "would not add any relevant evidence to his self-defense argument because it did not matter why he was being attacked." *Id.* at 10. As indicated, Davis contends that putting the jewelry evidence before the trial court would have assisted in enhancing the credibility of his testimony about being robbed, providing the trial court "with an entirely different (and accurate) scenario." Amended Pet. at 25. However, the appellate court clearly rejected that contention on post-conviction review when it concluded the jewelry evidence would have not enhanced the self-defense argument. This conclusion was not unreasonable. Even if Davis's credibility may have been enhanced by some degree by the trial court's knowledge of the jewelry, the addition of the evidence would not have painted an "entirely different scenario"; Davis's self-defense argument had already been made. The same is true of any possible references in police reports to Davis's jewelry, which Davis says he discovered via his own investigation. This evidence perhaps could have buttressed Davis's credibility to some extent, but counsel's decision not to present

it did not necessarily amount deficient performance when other self-defense evidence was available—as it was.  The appellate court's determination that trial counsel was not deficient for declining to pursue this evidence was not an unreasonable application of *Strickland*.

The appellate court's conclusion that Davis could not demonstrate prejudice from his counsel's performance likewise was not unreasonable.  The appellate court pointed to Sergeant Lynch's testimony about Davis shooting Hogan as Hogan crawled away, as well as Davis's flight from the scene and autopsy evidence regarding the trajectory of the bullet in Hogan's back.  Davis has challenged the sufficiency of this evidence via a separate claim, and as discussed above, that claim lacks merit.  Davis does cite the trial court's statement that it was uncertain where the gun came from that he used to shoot Hogan.  But the appellate court on post-conviction review accounted for this, concluding "that even if defendant was being robbed for his jewelry prior to the incident that resulted in Hogan's death, he clearly became the aggressor when he fired a shot into the back of an unarmed man."  Ex. H at 10.  Davis has not shown a reasonable probability that the result of his trial would have been different but for the errors of his trial counsel, and the appellate court's decision on that question was not unreasonable.

## C.    Arguments from Davis's reply and motion to amend

In his reply and motion to amend, Davis, via his counsel, first notes that his counsel "found additional facts which create meritorious claims that principles of federal law were unreasonably applied."  Repl. at 2.  He proceeds to outline "principles of established federal law unreasonably applied," starting with the notion that Davis "has a substantive due process constitutional right to bodily integrity, self-preservation, and

self-defense." *Id.* at 4. He cites in this regard pre-Civil War decisions from the Illinois Supreme Court, the U.S. Supreme Court's recent cases on the Second Amendment, and the statement from *Griswold v. Connecticut*, 381 U.S. 479, 487–88 (1965), invoking the "penumbra" of due process rights in this country. Davis then argues that the state courts "erroneously applied" a six-element test to determine self-defense in his case, contending that the test does not comport with the Illinois self-defense statute, which permits the use of deadly force to prevent a "forcible felony." Repl. at 9–10 (citing 720 ILCS 5/7-1(a)). Trial counsel's failure to argue the forcible felony element of self-defense, he contends, constituted ineffective assistance; "the outcome of the trial would have been different if trial counsel would have realized that the 6 elements failed to address the forcible felony scenario." *Id.* at 11. Davis also argues, somewhat opaquely, that his due process rights were violated because the burden was shifted to him to disprove an element of his offense, *id.* at 11, and that "his trial counsel's [sic] conduct not only failed to raise this error, but erroneously advised petitioner that there was no evidence to support that claim." *Id.* at 12. Finally, Davis says, the six-element self-defense test that the state courts used in his case "violated his due process rights," because the test permits the prosecution to defeat a self-defense claim by negating one of the six elements, which is inconsistent with the state self-defense statute. *Id.*

Lemke responds that it is unclear what additional claims Davis intends to assert with his reply and motion to amend. Lemke argues that some of the arguments in the reply go to Davis's sufficiency-of-the-evidence and ineffective assistance claims and thus do not warrant granting a motion to amend. Lemke also contends, however, that any new claims in the reply about Davis's constitutional right to self-defense or his

counsel's ineffectiveness for failing to comprehend the law of self-defense in Illinois are procedurally defaulted and lacking in merit.

It appears that Davis's motion to amend is primarily concerned with Davis's filing of his amended petition without seeking leave of this Court to amend and with "fully organiz[ing] the facts . . . and plac[ing] them in a meaningful light."  Supp. Repl. at 5. The Court is willing to take Lemke's invitation in his supplemental response to find that Davis's amended claims, from his amended petition and reply/motion to amend, relate back to his earlier claims under *Mayle*, 545 U.S. at 655.  Nonetheless, the Court must still determine whether the arguments in Davis's reply should be considered further arguments in support of claims he has already made, or new claims.[4]

The Illinois statute on self-defense says that "use of force which is intended or likely to cause death or great bodily harm" is justified if a person "reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony."  720 ILCS 5/7-1(a).  In affirming the dismissal of Davis's post-conviction petition, the appellate court listed six elements that "a defendant must offer" to make out a self-defense claim:

(1) unlawful force had been threatened against him;
(2) he was not the aggressor;
(3) there was an imminent danger of harm;
(4) the use of force was necessary;
(5) he had an actual belief that danger existed that required
the use of force applied; and
(6) his belief was objectively reasonable.

---

[4] The Court notes that the reply and motion to amend were less than clear on whether Davis was attempting to make new claims or simply back up old ones with additional arguments.  In addition, the reply failed to respond to many of Lemke's arguments against Davis's claims from his original and amended habeas petitions.  The Court reads the reply as the amendment Davis wanted to file.

Ex. H at 9 (citing *People v. Lee*, 213 Ill. 2d 218, 225, 821 N.E.2d 307 (2004)). Davis is correct to state when he says in his reply that the words "forcible felony" are not in the six-element self-defense test the appellate court used in his case. But Davis had already argued, in his amended petition, that his actions constituted proper self-defense specifically in responding to a "forcible felony" against him. *See* Amended Pet. at 13. This Court has already rejected that argument, noting that any forcible felony occurring prior to Davis's shooting Hogan did not alter the fact that Davis then shot Hogan, who was unarmed, in the back as he crawled away.

To the extent that Davis posits new claims in his reply, he provides no basis to believe they are not procedurally defaulted. At no stage of his two rounds of review in the Illinois state courts did Davis argue that (1) he had a substantive due process constitutional right to self-defense; (2) his trial counsel was ineffective for not "realiz[ing] that the 6 elements [of the self-defense test] failed to address the forcible felony scenario," Repl. at 11; (3) the burden was improperly placed on him to disprove an element of his offense; or (4) the six-element Illinois self-defense test "violated his due process rights," *id.* at 12. In his reply, Davis does reference his earlier argument that trial counsel was ineffective for failing to present evidence of his jewelry to the trial court, but the Court has already considered and rejected that argument. The notion that trial counsel did not understand the law of self-defense in Illinois and should have argued a forcible felony was in progress against Davis is new.

Furthermore, at no point in his reply or supplemental reply does Davis argue that he can show cause for the default or prejudice resulting from the error or that review of these claims is necessary to correct a fundamental miscarriage of justice. *See House v.*

*Bell*, 547 U.S. 518, 536 (2006).  The Court therefore declines to review the newly-asserted claims.

**D.      Certificate of appealability**

When a district court enters a final judgment that dismisses a prisoner's habeas corpus petition, it must issue or deny a certificate of appealability (COA).  "[F]ederal courts of appeals lack jurisdiction to rule on the merits of appeals from habeas petitioners" in the absence of a COA.  *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003).  To obtain a COA, the petitioner must make "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  A court should issue a COA if it determines that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (internal quotation marks omitted).  When a district court denies a claim on procedural grounds, the petitioner must show both that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."  *Id.*

The Court's determinations that the state courts reasonably adjudicated some of Davis's claims, and that other claims are procedurally defaulted, are not fairly debatable.  The Court therefore declines to issue a certificate of appealability.

## Conclusion

For the foregoing reasons, the Court denies Davis's petition for a writ of habeas corpus [docket nos. 12 & 13] and directs the Clerk to enter judgment in favor of the

respondent.  The Court also declines to issue a certificate of appealability.  Davis's counsel is directed to provide a copy of this decision to his client promptly and to certify to the Court that he has done so.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  February 13, 2014